# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
December 11, 2015 Session

### IN RE MICHAEL B. M., ET. AL.[1]

**Appeal from the Circuit Court for Knox County**
**No. 128701     Hon. Gregory McMillan, Judge**

---

### No. E2014-02481-COA-R3-JV-FILED-JANUARY 29, 2016

---

This action concerns a petition for custody filed by the maternal grandmother of three minor children. The juvenile court denied the petition, and the circuit court affirmed the denial on appeal following a de novo hearing. The maternal grandmother now appeals to this court. We dismiss the appeal in light of the adoption of the children during the pendency of this appeal.

### Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and CHARLES D. SUSANO, JR., J., joined.

Jamie F., Knoxville, Tennessee, pro se.

Herbert H. Slatery, III, Attorney General and Reporter, and Rebekah A. Baker, Senior Counsel, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

### I.     BACKGROUND

Michael B. M., Adrian L. B., and Mary K. B. (collectively "the Children") were born to Christian M. ("Mother") in March 2008; March 2011; and December 2012, respectively. Mother identified either Marquas O. or Caleb J. as the father of Michael

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties. While this case concerns a custody petition, we will adhere to the aforementioned privacy policy because the parental rights of the parents to the minor children at issue were also terminated during the pendency of the action.

and Mario B. as the father of Adrian and Mary. At some point, Mother left the Children in the care of her stepmother, Jamie. F. ("Grandmother"). In December 2012, Grandmother filed a petition for custody of the Children, alleging that the Children were dependent and neglected by Mother. Mary was included in the petition even though she was not yet born. While Grandmother filed the petition, the Children actually resided with her and the maternal grandfather, Daniel L. ("Grandfather") (collectively "Grandparents"). Mother later executed a letter in which she purported to award temporary custody of Michael and Adrian to Grandmother and to relinquish her parental rights of Mary and award custody to Grandmother.

On March 21, 2013, a hearing was held before the juvenile court magistrate, who ordered Grandmother to provide a list of her prescription medication and Grandfather to "provide proof . . . regarding the safety of the [Children] while in his care." Despite the magistrate's order, Grandfather refused a drug screen. One week later, another hearing was held before the juvenile court magistrate. Upon discovering that the Children were in the unsupervised care of Grandfather, the magistrate ordered Grandmother to retrieve the Children and return to court within the hour. Upon her return with Grandfather and the Children, Grandfather vomited in the lobby of the courthouse. Thereafter, the magistrate entered a bench order requiring the Children to be delivered to the Tennessee Department of Children's Services ("DCS") for immediate protective custody, finding probable cause that the Children were dependent and neglected and that placement with Grandparents was not suitable in light of Grandfather's violent criminal history and refusal to provide a drug screen and Grandparents' use of prescription medication. The Children were placed into foster care.

Grandmother amended her petition for custody to include information concerning Grandfather's involvement. She alleged that she suffered from permanent hearing loss and that Grandfather was willing to provide assistance with the Children when necessary. However, she claimed that Grandfather was also willing to live elsewhere if required by the court. She noted that Grandfather would submit to drug testing and consent to the release of his psychiatric records and criminal history. She acknowledged that Jessica L., Grandfather's daughter, had accused him of sexual abuse. She asserted that he was willing to undergo a psychosexual profile and abide by any recommendations.

On May 24, 2013, another hearing was held before the juvenile court magistrate. Following the hearing, the magistrate adjudicated the Children as dependent and neglected as a result of Mother's unresolved substance abuse issues and current criminal issues. The magistrate noted that the respective putative fathers could not be located. Relative to the custody petition, the magistrate found that it was not in the best interest of the Children to place them with Grandmother. The magistrate stated,

As to the petition for custody and the amended petition for custody filed by [Grandmother], the [c]ourt finds the following based upon the testimony and evidence presented:

That [Grandparents] are married and reside in the same home; that this is the second marriage for both parties; that [Grandfather] has reported conflicting information to [DCS] as to his relationship to [Mother], at one point identifying her as one of his three biological children and at another point reporting that she was already born before he became involved with his first wife . . . ; that [DCS] has previously indicated [Grandfather] for "sex abuse/exploitation" and "drug exposed child" in an investigation involving [Jessica] . . . who is currently in foster care in Blount County, Tennessee; that [Grandfather] has a criminal record; that [Grandfather] has completed a psycho-sexual assessment which indicated a moderate risk to reoffend; that [Grandfather] has received mental health services through Cherokee and is currently in counseling . . . and receiving medication management through Helen Ross McNabb [for an extensive amount of medication] . . . ; that [Grandmother] has received mental health services through Cherokee in the past and is currently receiving counseling . . . and reports she receives medication for anxiety, depression and pain . . . ; that Colvin Idol, who completed assessments on [Grandparents] stated in his report that "the interviewer cannot recommend them as ideal parents or grandparents"; that at the time of filing her petition, [Grandmother] completed a sworn Application for Temporary Legal Custody which failed to list [Grandfather] as residing in her home and failed to reveal her prior involvement with the police and failed to reveal [Grandfather's] prior involvement with the police, the [c]ourt system and [DCS].

The magistrate also found that those supervising Grandparents during visitation reported inappropriate conversations between Grandparents and the Children and that Grandfather appeared under the influence during his supervised visitation.

Grandmother appealed the magistrate's decision. The juvenile court confirmed the magistrate's findings and transferred the action to the Knox County Fourth Circuit Court for a de novo hearing. Pending the hearing, the circuit court awarded Grandparents supervised visitation. The court later suspended Grandfather's supervised visitation for failure to follow visitation protocol.

A hearing on the petition for custody was held on September 22, 2014. Mother stated that she was amenable to transferring custody of the Children to Grandmother. She denied ever observing inappropriate behavior by Grandfather. She provided that she

currently resided with Grandparents and confirmed that Grandfather no longer lived in the residence. She denied ever objecting to Grandfather's presence in the home or to Grandparents' supervised visitation with the Children.

Marquas testified that he was amenable to transferring custody of Michael to Grandmother. He provided that he currently resided with Grandparents and confirmed that Grandfather no longer lived in the residence.

Terry Taylor, Grandmother's sister, confirmed that Grandfather no longer lived in Grandmother's residence. She provided that she supervised the Children on occasion and claimed that the Children never reported that Grandparents behaved inappropriately.

Sally Hines testified that she initially sought custody of the Children. She provided that Grandfather was unsuitable as a caregiver because he was reliant upon prescription pain medication.

Grandparents testified as to their relationship with the Children. Grandmother provided that she provided care for the Children for the majority of their respective lifetimes and that their absence would be detrimental to her well-being. She explained that the Children helped her recover from the loss of her own daughter. Grandfather attested that he loved the Children and would do anything for them.

Grandmother denied lying on her initial petition for custody. She explained that Grandfather lived with his brother at the time she filed her petition and that they remained separated for approximately three months. She agreed that she did not inform DCS that they were separated during the initial home visit. She acknowledged that they separated solely to allow her to acquire custody of the Children. She explained that Grandfather was a "good man" and was "good to [the Children]."

Grandmother acknowledged that she had been arrested for shoplifting and contributing to the delinquency of a minor. She explained that the charges were later dismissed. She denied any prior involvement with DCS. She agreed that DCS entered a no contact order against Grandfather prohibiting him from contacting his minor daughter, Jessica, based upon allegations of sexual abuse. She agreed that she allowed Mother and Marquas to reside in her home, despite their instability.

Grandfather confirmed that he was separated from Grandmother and no longer lived in the same residence. He agreed that a no contact order had been entered against him concerning Jessica in March 2010. He acknowledged his lengthy criminal history and provided that he spent approximately 13 years in prison. He also acknowledged that

he used numerous prescription medications but provided that he recently quit taking his medication for bipolar disorder because the medication made him act "loony."

Jessica denied that Grandfather ever touched her in an inappropriate manner. She acknowledged that she had previously reported that he had sexually abused her. She admitted that Grandmother asked her to testify and transported her to the court hearing.

Enoch Colvin Idol, a licensed professional counselor, testified that he provided an alcohol and drug assessment on Grandparents and a psycho-sexual risk assessment on Grandfather. He recalled that Grandfather reported that he resided in the same residence as Grandmother for at least ten months prior to the assessment in April 2013. He found that Grandfather was at a moderate risk level for reoffending according to the psycho-sexual risk assessment. He explained that Grandfather possessed a lengthy criminal history, including an aggravated rape charge that had been reduced to a lesser offense. He said that Grandfather reported that he had experienced serious psychological and emotional issues within the past 30 days prior to the assessment. Relative to the alcohol and drug assessments, he stated that neither Grandmother nor Grandfather presented a need for treatment for drug use because they were taking medication as prescribed. However, he could not recommend them as a proper placement for the Children based upon their mental health diagnoses and use of prescribed opioids for medical ailments.

Four social workers testified concerning their interaction with Grandparents. Kelly Myers, a DCS employee, testified that she performed the initial home study in response to the petition for custody. She recalled that Grandparents were present for the study and never advised her that Grandfather lived in another residence. She could not recommend Grandparents as a proper placement based upon Mr. Idol's assessment, issues pertaining to prescription medication, and her interaction with Grandfather, who appeared to be under the influence of "some kind of substance." She noted that Grandfather had been indicated by DCS for sexual abuse of Jessica. She recalled that Grandfather was confused as to the number of his biological children and initially reported that Mother was not his biological child. She stated that she was also present for a few supervised visitations. She reported that Grandparents whispered with the Children and that Grandfather slurred his words and appeared drowsy.

Ellen Mayner, a Helen Ross McNabb employee, testified that she supervised approximately five visitations, beginning in March 2013. She reported that every visit presented a cause for concern. She explained that Grandparents whispered with the Children, used their cellular telephones, paid more attention to Mary, called themselves "Mommy" and "Daddy," left the approved visitation area, raised their voices, and used inappropriate language. She asserted that Grandfather would "stumble" and "slur his words." She agreed that she was unaware as to whether he was under the influence of

prescribed medication or illegal medication. She explained that he could not care for the Children without assistance even if he were taking medication as prescribed. She provided that she could not recommend placement of the Children with Grandparents based upon her supervision of them.

Scott Williams, a Helen Ross McNabb employee, testified that he supervised approximately four visitations, beginning in January 2014. He characterized the quality of visitation as "strange" and reported that Grandparents referred to themselves as "Mommy" and "Daddy," despite his repeated redirection. He recalled that Grandparents also whispered with the Children, allowed them to sit on their laps, and told the Children that they planned to take them on vacation.

Tiffany Murray, a DCS employee, testified that she began supervising Grandparents' visitation with the Children in March 2014. She reported that Grandparents had improved in their behavior but asserted that she still had cause for concern. She reported that Grandfather placed Mary on his lap, despite prior instruction to refrain from such behavior. She also recalled that Grandfather referred to himself as "Daddy" and appeared under the influence. She acknowledged that Grandfather had been indicated for a drug exposed child and sexual abuse of Jessica in 2009.

Ms. Murray testified that DCS had begun termination proceedings and had already terminated Caleb and Mario's parental rights. She reported that Mother recently tested positive for opiates, Methadone, and Oxycodone and that Marquas had tested positive for THC. She expressed concern for the Children if they were placed in a home where Mother and Marquas were allowed to reside. She recalled that Mother and Marquas objected to the placement of the Children with Grandmother.

Following the presentation of the above evidence, the circuit court denied the petition for custody, finding that it was not in the best interest of the Children to award custody to Grandmother. The court found that the testimony presented by Mother and Jessica pertaining to the Children's potential for harm while in Grandfather's care was not credible. Grandmother filed a timely notice of appeal. During the pendency of the appeal, Mother's parental rights to the Children were terminated. Marquas's parental rights to Michael were also terminated. The Children were adopted on May 27, 2015.

## II.    ISSUES

Grandmother raised an issue on appeal that we consolidate and restate as follows:

A.    Whether the trial court erred in denying the petition for custody.

DCS raised an issue on appeal that we consolidate and restate as follows:

B.    Whether any issue pertaining to the denial of the petition for custody is now moot in light of the Children's adoption.

## III.    STANDARD OF REVIEW

We review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). Because the trial court is in the best position to observe witnesses and evaluate their demeanor, we afford great deference to a trial court's credibility determinations. *Hughes v. Metro. Govt. of Nashville and Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). We review questions of law de novo with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006).

In matters of child custody, trial courts are vested with broad discretion, and appellate courts will not interfere with the trial court's decision except upon a showing of erroneous exercise of that discretion. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 836-37 (Tenn. Ct. App. 1997). "'Because [c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decisions.'" *Hyde v. Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct.12, 2010) (quoting *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)).

## IV.    DISCUSSION

### A. & B.

As a threshold issue, we must address DCS's assertion that any issue pertaining to the denial of the petition for custody is now moot in light of the Children's adoption. "An issue becomes moot if an event occurring after the commencement of the case extinguishes the legal controversy attached to the issue, or otherwise prevents the prevailing party from receiving meaningful relief in the event of a favorable judgment[.]" *City of Memphis v. Hargett*, 414 S.W.3d 88, 96 (Tenn. 2013) (citations omitted).

Accordingly, "[t]o be justiciable, an issue must be cognizable not only at the inception of the litigation but also throughout its pendency." *Id.* (citation omitted).

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the Federal and State constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). While this right is fundamental, it is not absolute. *State v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only so long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re S.M.*, 149 S.W.3d 632, 638-39 (Tenn. Ct. App. 2004).

It is true that Grandmother parented the Children for a significant period of time. However, she never possessed any constitutional rights to the Children. Any proceeding in which she sought to obtain custodial rights to the Children was automatically suspended upon the filing of the adoption petition. Tenn. Code Ann. § 36-1-116(f)(2).[2] Once adopted, the Children became "the lawful [children] of [the adoptive] parents, the same as if [they] had been born to the [adoptive] parents, for all legal consequences and incidents of the biological relation of parents and children." Tenn. Code Ann. § 36-1-121(a). Additionally, upon entry of the adoption order,

> the adoptive parents shall not thereafter be deprived of any rights in the child[ren], at the insistence of the . . . biological or prior legal parents or guardian of the child[ren] or any other person or agency except in the same manner and for the same causes as are applicable in proceedings to deprive biological or legal parents or guardians of their children or wards as provided by law.

Tenn. Code Ann. § 36-1-122(a). With these considerations in mind, we hold that any issues pertaining to the denial of Grandmother's custody petition are rendered moot in light of the Children's adoption.

---

[2] "[A]ny proceedings that may be pending seeking the custody [of a child] who is in the physical custody of the petitioners on the date the petition is filed, or where the petitioners meet the requirement of § 36-1-111(d)(6), shall be suspended pending the court's orders in the adoption proceeding, and jurisdiction of all other pending matters concerning the child and proceedings concerning establishment of the paternity of the child shall be transferred to and assumed by the adoption court; provided, that until the adoption court enters any orders affecting the child's custody or guardianship as permitted by this part, all prior parental or guardian authority, prior court orders regarding custody or guardianship, or statutory authority concerning the child's status shall remain in effect."

## V. CONCLUSION

This appeal is dismissed, and the case is remanded to the trial court for collection of costs assessed below.  Costs of the appeal are taxed to the appellant, Jamie F.

_____
JOHN W. McCLARTY, JUDGE